UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KELLI ANN GRABOW, Individually and
as Personal Representative of the Estate
of KRISTINA PROCHNOW, deceased

        Plaintiff,

v.                                               Case No. 12-10105

COUNTY OF MACOMB, CORIZON INC.,
CORRECTIONAL MEDICAL SERVICES, INC.,         HON. AVERN COHN
STEPHANIE HARMON, AMY WHITE, and
MICHELLE MASON,

        Defendants.

_____/

## MEMORANDUM AND ORDER GRANTING
## PLAINTIFF'S MOTION TO COMPEL DISCOVERY (Doc. 50)

### I. INTRODUCTION

This is a 42 U.S.C. § 1983 case. Plaintiff Kelli Ann Grabow, as the personal representative of the estate of Kristina Prochnow, is suing defendants for denying Prochnow medical treatment while she was an inmate at the Macomb County Jail. Prochnow committed suicide in her cell. Grabow says defendants knew that Prochnow was at risk of committing suicide and did not do anything to prevent it.

Grabow is suing:

(1) County of Macomb (the "County");

(2) Corizon, Inc. ("Corizon"), the company hired by the County to provide medical services to inmates at the time of Prochnow's suicide;

(3) Correctional Medical Services, Inc. ("CMS"), formerly Corizon[1];

(4) Stephanie Harmon, mental health clinician at CMS;

(5) Amy White; a deputy sheriff in the Macomb County Sheriff's Department; and

(6) Michelle Manson, mental health clinician at CMS.

Grabow also sued the following individuals which the parties agreed to dismiss:

(1) Anthony Wickersham, Macomb County Sheriff;

(2) Catherine Stalinski, Health Services Administrator at CMS;

(3) Kelly Hedtke; Mental Health Director at CMS;

(4) Gregory Shumacher, a deputy sheriff in the Macomb County Sheriff's Department; and

(5) Jail Administrator Sanborn.

See (Docs. 51, 52).

The second amended complaint is in four counts, phrased by Grabow as follows:

| Count I: | Denial of Medical Treatment - For Serious Medical Needs (County, CMS, Harmon, White, Manson); |
| Count II: | Failure to Train, Inadequate Policies and/or Procedures, Customs and Practices and Failure to Supervise - Deliberate Indifference (County); |
| Count III: | Intentional Infliction of Emotional Distress (County, CMS, Harmon, White, Manson); and |
| Count IV: | Gross Negligence, Intentional, Willful and Wanton Conduct (County, CMS, Harmon, White, Manson). |

Now before the Court is Grabow's motion to compel discovery (Doc. 50). The Court held a hearing on the motion on June 26, 2013. Because the Court for the first time raised

---

[1] Corizon was formerly named CMS. For purposes of this motion, both Corizon and CMS will be referred to as CMS.

the question of whether federal or state law applies to the issues raised in Grabow's motion, it allowed CMS five days to file a supplemental brief. CMS has filed a supplemental brief (Doc. 56) and the motion is ready for decision. For the reasons that follow, the motion is GRANTED.

## II. BACKGROUND

### A. Prochnow's Suicide[2]

On Saturday, August 13, 2011, Prochnow was arrested for "domestic violence and resisting arrest" and taken to the City of New Baltimore Police Department ("NBPD"). (Doc. 19 at 5, Pl's. Second Am. Compl.). Prochnow was then transferred to the Macomb County Jail (the "jail") from the NBPD. (*Id*.).

Upon arrival at the jail White conducted an intake interview of Prochnow. (*Id.* at 6). During the interview, White did not directly ask Prochnow the questions in the jail's "computer generated form" which "embodies questions that are designed and intended to aid in the decisions of assigning temporary cell assignments and appropriate supervision levels within the facility." (*Id*.). Instead, White filled out the form herself and answered "no" to the questions asking whether Prochnow was suicidal or going to hurt herself. (*Id*.). White also failed to complete the portions of the form asking about Prochnow's "prior incarceration history." (*Id.* at 6–7).

On the same day, around 6:25 PM, Mason conducted a "medical intake screening" of Prochnow. (*Id.* at 7). At the intake, Mason learned that Prochnow "had a highly significant mental health history and was dependant on anti-psychotic medications to

---

[2] The facts are recited as they are stated in the second amended complaint (Doc. 19).

3

control her thoughts, moods and behavior." (*Id.*).  Mason noted that Prochnow appeared to be "very angry & hyper-verbal; unable to stay still." (*Id.*).  Prochnow told Mason that she had previously been treated for mental illness and that she attempted suicide by cutting her wrists a year and a half prior to her incarceration at the jail.  (*Id.*).  Mason reported that Prochnow told her that she was no longer suicidal.  (*Id.* at 7–8).  However, Prochnow did tell Mason that she "was feeling hopeless and helpless with nothing to look forward to." (*Id.* at 8).

After completing the medical intake, Mason placed Prochnow in a "detoxification setting" with "an opioid monitor and benzodiazepine monitor for safety." (*Id.*).  She was "kicking and yelling in her cell." (*Id.* at 9).  Although Mason was now aware of Prochnow's "past suicide attempt and her current mental status and dependency on anti-psychotic medications," Mason did not place Prochnow on "high observation status." (*Id.* at 8).  Nor did Mason contact Prochnow's family members to inquire as to the proper dosage/frequency of medications needed to control Prochnow's mental health.  (*Id.*).

Other jail employees were familiar with Prochnow because she had previously been detained at the jail over fifteen times during the period from 2002 until her death in 2011.  (*Id.*).  During each of these detentions, Prochnow was assessed as a "high-risk for self-destructive behavior, including suicide." (*Id.* at 9).

Mason referred Prochnow for a mental health evaluation by Harmon on the morning of August 14, 2011.  (*Id.*).  Without speaking to or seeing Prochnow, Harmon determined that Prochnow did not need to be placed on "observational status."  (*Id.*).

On Monday, August 15, 2011, Prochnow was transported by jail personnel to the Macomb County Circuit Court for arraignment in her criminal case. (*Id.* at 10). The judge ordered a $5,000.00 bond for each of the charges. (*Id.*).

After the arraignment, Prochnow was placed in a holding cell awaiting transport back to the jail. (*Id.*). Prochnow "acted out and/or behaved in such a fashion that was highly evident that she was rapidly mentally deteriorating and needed prompt and immediate medical/psychiatric treatment and/or her medication." (*Id.*).

Prochnow was returned to the jail where she was again placed in a holding cell. (*Id.* at 10–11). In the holding cell, Prochnow "continued to engage[] in self-destructive behavior that was witnessed by" jail personnel. (*Id.* at 11). Prochnow was "screaming constantly, banging her head against the walls and kicking at the walls." (*Id.*).

In response to Prochnow's acting out, jail employees placed her on "lockdown." (*Id.*). Prochnow's bed sheets, blankets and shoe strings were not removed from her cell. (*Id.*). Around 3:22 pm, Shumacher found Prochnow "hanging from her bunk by her bed sheet." (*Id.*).

Prochnow was taken to the Mt. Clemens Regional Medical Center where it was determined that she suffered from "anoxic encephalopathy and was placed on a ventilator." (*Id.* at 11–12). Two days later, Prochnow died from her injuries. (*Id.* at 12).

Grabow filed this case as personal representative of Prochnow's estate.

### B. CMS's "Mortality" Review

#### 1. The Policy

At the time Prochnow committed suicide on August 15, CMS provided healthcare

5

services to the jail's inmates.  CMS had in place what it terms as a "mortality review" policy.
(Doc. 54-3, CMS Mortality Review Policy).  Under the policy, "[a]ll inmate deaths require
a review of the inmate's chart by the [m]edical director and a confidential death summary
report within 48 hours of the inmate's death."  (*Id.* at 2).  In addition, within thirty days, "[a]ll
inmate deaths require a Mortality Review. . . ."  (*Id.*).  The mortality review is defined in the
policy as a "Quality Improvement function."  (*Id.*).  In addition, "[a] formal written report of
Mortality Review is completed and stamped with the Qaulity Improvement Confidentiality
statement."  (*Id.* at 3).

### 2. The Mortality Review After Prochnow's Suicide

CMS began a mortality review the day Prochnow was found hanging in her cell.
Pursuant to the policy, Hedtke reviewed Prochnow's medical chart.  (Doc. 54-5 at 6, Hedtke
Dep.).  After reviewing Prochnow's chart, and participating in the mortality review process,
Hedtke made recommendations about the performance of CMS employees and whether
they violated any CMS policies in the way they handled Prochnow.  (*Id.* at 12).

Stalinski also participated in the mortality review.  Pursuant to CMS's policy, Stalinski
completed a two part report.  The first part consisted of fact finding and involved persons
from the jail outside of CMS.  The second part, involving only CMS's medical personnel,
reviewed whether those involved were properly trained, and whether they followed CMS
policy and procedure, etc.

### C. The Depositions

As part of discovery, Grabow took the depositions of Hedtke and Stalinski,[3]

---

[3] The parties stipulated to dismiss all claims against Hedtke and Stalinski.

employees of CMS, which will be discussed more fully below.

### 1. Kelly Hedtke

During Hedtke's deposition, she was asked multiple questions relating to whether Prochnow should have been more closely observed, whether Hedtke knew if others at CMS believed Prochnow should have been more closely observed, and whether anyone at CMS was terminated as a result of Prochnow's death. Hedtke's counsel instructed her not to answer these questions and asserted the peer review privilege.

### 2. Catherine Stalinski

Grabow also took Stalinski's deposition. Prior to taking Stalinski's deposition, Macomb County provided Grabow with a letter written by Stalinski on August 19, 2011 about Prochnow's suicide. (Doc. 50-4 at 2, Stalinski letter). In the letter, Stalinski stated,

> As requested, I am submitting my statement below in regards to inmate Prochnow. . . .
>
> As the supervisor at the Macomb County Jail following the Mental Health Referral criteria and the documentation on the intake medical screen and the Mental Health referral I would expect that Inmate Prochnow . . . be placed in Close Observation.
>
> Based on the Mental Health referral documentation I would expect that the Mental Health worker would follow up with this inmate to identify the need of observation status.

(*Id.*).[4]

At her deposition, Stalinski was asked questions about the review of Prochnow's chart after her suicide and the subsequent firing of two CMS employees. Stalinski's

---

[4] Defendants say that this letter was sent to Grabow's counsel in error. Defendants have asked the letter be returned.

counsel raised the peer review privilege and directed her not to answer multiple questions.

## III. LEGAL STANDARD

### A. Discovery

Rule 26 of the Federal Rules of Civil Procedure provides, in pertinent part

> Unless otherwise limited by court order . . . , [p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense–including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter. . . Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b).

### B. Michigan's "Peer Review" Privilege

Michigan law recognizes a statutory "peer review" privilege. The privilege "may be invoked for records, data, and knowledge collected for or by an individual or committee assigned a review function." *Ligouri v. Wyandotte Hosp. and Med. Ctr.*, 253 Mich. App. 372, 376 (2002) (citing *Gallagher v. Detroit-Macomb Hosp. Ass'n*, 171 Mich. App. 761, 768 (1988)).

The peer review privilege is set forth in three separate statutes in Michigan's Public Health Code. See Mich. Comp. Laws § 333.20175(8); Mich. Comp. Laws § 333.21515; Mich. Comp. Laws § 331.533. The peer review privilege "is designed to assure that honest assessment and review of performance is undertaken in peer review committees." *Centennial Healthcare Mgmt. Corp. v. Mich. Dept. of Consumer & Indus. Servs.*, 254 Mich. App. 275, 289 (2002). As summarized by the Michigan Supreme Court, "[t]o encourage and implement productive peer review procedures, the Legislature has provided that

8

information and records developed and compiled by peer review committees be confidential and not subject to court subpoena." *In re Attorney General*, 422 Mich. 157, 161 (1985) (citations omitted).

### C. Federal Law Privilege

Where federal law supplies the rule of decision, "[t]he common law–as interpreted by United States courts in the light of reason and experience–governs a claim of privilege" unless otherwise provided by the United States Constitution, a federal statute, or rules prescribed by the Supreme Court. Fed. R. Evid. 501. The Supreme Court has stated that "Rule 501 . . . authorizes federal courts to define new privileges by interpreting 'common law principles . . . in the light of reason and experience.'" *Jaffee v. Redmond*, 518 U.S. 1, 8 (1996). Indeed, as recognized in the Senate Report accompanying the 1975 adoption of the Federal Rules of Evidence, "Rule 501 'should be understood as reflecting the view that the recognition of privilege based on a confidential relationship . . . should be determined on a case-by-case basis.'" *Id.* (citing S. Rep. No. 93-1277, p. 13 (1974)).

In determining whether a privilege should be recognized in a specific instance, courts must start with the fundamental maxim that "the public . . . has a right to every man's evidence." *Id.* at 9 (citing *United States v. Bryan*, 339 U.S. 323, 331 (1950); *United States v. Nixon*, 418 U.S. 683, 709 (1974)). Thus, "[e]xceptions from the general rule disfavoring testimonial privileges may be justified" only when there is a "'public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.'" *Id.* (quoting *Trammel v. United States*, 445 U.S. 40, 50 (1980)). In other words, a new evidentiary privilege should not be created unless it "promotes sufficiently important interests to outweigh the need for probative evidence. . ." *Trammel*, 445 U.S. at 51.

9

## IV. DISCUSSION

### A. Applicability of Michigan Peer Review Privilege

Michigan's peer review privilege does not apply in this case.[5]  Because this is a prisoner civil rights case brought under § 1983, federal law supplies the rule of decision, and Rule 501 applies.  Indeed, "[t]he claims made here are federal constitutional claims . . . It thus appears particularly inappropriate to allow the use of state evidentiary privileges." *Leon v. Cnty. of San Diego*, 202 F.R.D. 631, 636 (S.D. Cal. 2001); see also *Agster v. Maricopa Cnty.*, 422 F.3d 836, 839 (9th Cir. 2005) ("But we are not bound by Arizona law. . . ."). "Where, as here, it is alleged that a defendant acted under color of state law to violate a citizen's rights, '[t]he appropriateness of deference to a state's law of privilege is diminished.'" *Weiss v. Cnty. of Chester*, 231 F.R.D. 202, 207 (E.D. Pa. 2005).

Although "Rule 501 has been recognized as allowing the adoption of existing state evidentiary codes to govern federal cases where the state rules are not in conflict with the federal rules," Michigan's medical peer review privilege conflicts with and harms "federal substantive and procedural policy" when applied in a § 1983 deliberate indifference case. See *Leon*, 202 F.R.D. at 635 (explaining that California's peer review privilege conflicts with liberal discovery rules applicable in federal courts in § 1983 deliberate indifference case). Indeed, "[t]he absolute bar on discovery provided by [Michigan's peer review privilege] conflicts with the liberal discovery rules applicable in federal courts, and it conflicts with the necessity of finding state action inherent in the federal civil rights law." *Id.* at 636.

---

[5] The Court assumes, without deciding, that Michigan's peer review privilege would exclude the knowledge acquired and materials generated from CMS's peer review.  The Court, however, finds no reason to expound on state law that is inapplicable to the underlying issues in the case.

Accordingly, Michigan's peer review privilege is inapplicable to this case.

To the extent that CMS invokes Michigan's peer review privilege for the pendant state law claims only, its argument must fail.  See *Agster*, 422 F.3d at 839–40 ("Where there are federal question claims and pendant state law claims present, the federal law of privilege applies.") (citing Fed. R. Evid. 501 advisory committee note; *Wm. T. Thompson Co. v. Gen. Nutrition Corp.*, 671 F.2d 100, 104 (3rd Cir. 1982)); see also *Pearson v. Miller*, 211 F.3d 57, 66 (3d Cir. 2000) (Because "applying two separate disclosure rules with respect to different claims tried to the same jury would be unworkable. . . , when there are federal law claims in a case also presenting state law claims, the federal rule favoring admissibility, rather than the state law privilege, is the controlling rule.") (citation and internal quotations omitted).

Finally, CMS misplaces its reliance on *United States v. Michigan*, 940 F.2d 143 (6th Cir. 1991).  In *Michigan*, the United States sued the State of Michigan under the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997 *et seq.*, seeking to improve prison conditions in multiple prisons within the State.  The district court eventually approved a consent decree aimed at improving the prison conditions.  The court of appeals reversed, holding that the district court did not "exercise restraint and reason in performing its oversight responsibility."  *Id.* at 168.  The court of appeals concluded that "Michigan has demonstrated a good faith effort to accomplish prison reforms," and the "trial court, should not, directly or indirectly. . . impose overly intrusive remedies upon the state."  *Id.*

In a footnote, the court of appeals discussed the peer review privilege, "an issue extensively negotiated between the United States and Michigan."  *Id.* at 163 n.12.  The State's proposed plan specified that only summaries of peer reviews conducted by the

11

prisons would be disclosed.  *Id.*  The district court modified the plan to require disclosure of peer review documents in their entirety.  The court of appeals stated that, "[t]o totally disregard the precise condition of the agreement between the parties by materially restructuring the reporting procedure to require disclosure of the actual internal peer review audits for medical/mental health/dental care in lieu of summaries was a material modification of . . . the agreement. . . ."  *Id.*

The court of appeals' passing discussion of the peer review privilege in *Michigan* is readily distinguishable from the facts here.  In *Michigan*, the court of appeals recognized that the parties voluntarily entered into a consent decree agreement "that endorsed the requirement of confidentiality to ensure the objectivity and integrity of the peer review procedure and approved the summarized reporting of the internal audit results."  *Id.*  In addition, the court of appeals noted that the peer review results were readily available from collateral sources "without disturbing the confidentiality of the peer review procedures and without forcing Michigan to violate existing valid statutory enactments."  *Id.*  That is not the case here.

### B. Peer Review Privilege – Federal Common Law

The inquiry does not end with the Court's finding that Michigan's peer review privilege does not apply to this case.  The Court must determine whether a peer review privilege exists in federal common law, and, if not, whether reason and experience requires a peer review privilege to be recognized in this particular circumstance.

### 1. No Federal Common Law Peer Review Privilege

The overwhelming majority of federal courts agree that there is not a federal common law peer review privilege.  See, e.g., *Leon*, 202 F.R.D. at 637 ("[T]his Court rejects

12

the idea that a peer review privilege exists in federal common law."); *Weiss*, 231 F.R.D. at 205 ("Privileges can be created by statute or by common law.  Unlike Pennsylvania's legislature, Congress has not statutorily enacted a medical peer review privilege under which it could be argued that PrimeCare's Mortality Review report is protected.  Nor does such a privilege exist under federal common law."); see also *Nilavar v. Mercy Health Sys.-Western Ohio*, 210 F.R.D. 597, 604 (S.D. Ohio 2002) (collecting cases).  As stated by another court, the majority of federal court cases, "along with the Supreme Court's recognition that a peer review privilege has no historical basis in the common law of the federal courts, *University of Pa. v. E.E.O.C.*, 493 U.S. 182, 195 (1990), persuades this Court that a physician peer review privilege does not exist in the federal common law." *Nilavar*, 210 F.R.D. at 604–05.

### 2. Creation of Peer Review Privilege is Unwarranted in This Case

Because there is no federal common law peer review privilege, the Court considers whether a peer review privilege in the context of a § 1983 deliberate indifference case "promotes sufficiently important interests to outweigh the need for probative evidence" such that a new privilege should be recognized in this case.  See *Trammel*, 445 U.S. at 51.  CMS says that the Court must recognize a peer review privilege in this case.  The Court disagrees and declines to create a new privilege in the circumstances of this case.

In considering whether to create a new privilege in a § 1983 deliberate indifference case, the Court is not writing on a clean slate.  The Ninth Circuit considered this very issue in the context of a case involving the suicide death of a prisoner in *Agster v. Maricopa County*, 422 F.3d 836 (9th Cir. 2005).  In *Agster*, Correctional Health Services ("CHS") provided medical care to inmates at the county jail.  *Id.* at 837–38.  In this role, CHS

13

provided medical care to inmate Charles Agster III after he was arrested, taken to the county jail, and placed in a restraint chair. *Id.* at 837. After Agster was placed in the restraint chair, his "respiration decreased, and he developed an irregular heartbeat." *Id.* Agster was transported to the hospital where he later died. *Id.*

CHS undertook a mortality review pursuant to its own policies. *Id.* at 838.

The plaintiffs, the personal representative of Agster's estate and his surviving parent, filed a § 1983 deliberate indifference case against individuals, Maricopa County, and the Maricopa County Sheriff's Office. *Id.* at 837. During the course of the case, the plaintiffs sought discovery of the mortality review.

Recognizing that it could "create a new privilege as a matter of federal common law," the court of appeals refused to do so. *Id.* at 839. First, the court of appeals reasoned that "Congress has considered the relevant competing concerns but has not provided the privilege itself." *Id.* Indeed, "[t]he Health Care Quality Improvement Act of 1986 granted immunity to participants in medical peer reviews, but did not privilege the report resulting from the process." *Id.* (citing 42 U.S.C. § 11101-11152). Nor did Congress provide for a privilege when it amended the act in 1987. *Id.* (citing Pub. L. No. 100-177, § 402(c)). Therefore, the court of appeals reasoned that, "[a]s Congress has twice had occasion and opportunity to consider the privilege and not granted it either explicitly or by implication, there exists a general objection to our doing so." *Id.*

Second, the court of appeals addressed specifically why the peer review privilege is not warranted in federal civil rights cases involving prisoner suicide deaths:

> The particular objection is that the privilege is sought to protect a report bearing on the death of a prisoner. Whereas in the ordinary hospital it may be that the first object of all involved in

14

> patient care is the welfare of the patient, in the prison context
> the safety and efficiency of the prison may operate as goals
> affecting the care offered.   In these circumstances, it is
> peculiarly important that the public have access to the
> assessment by peers of the care provided.   Given the
> demands for public accountability, which seem likely to
> guarantee that such reviews take place whether they are
> privileged or not, we are not convinced by the County's
> argument that such reviews will cease unless kept confidential
> by a federal peer review privilege.   Accordingly, we are
> unwilling to create the privilege in this case.

*Id.*

The district court in *Weiss v. Cnty. of Chester*, 231 F.R.D. 202 (E.D. Pa. 2005) also considered the identical issue that is now before the Court.  In *Weiss*, Donald Weiss, Jr. was transferred to Chester County Prison in Pennsylvania while awaiting a hearing and trial on domestic violence charges.  *Id.* at 203.  "On numerous occasions, Weiss met with, or attempted to meet with, mental health professionals at the prison."  *Id.*  Weiss eventually hung himself in his cell. *Id.*

After Weiss's suicide, PrimeCare Medical, Inc., a company that provided medical services to the jail's inmates, "convened a mortality review committee to conduct an internal investigation into [Weiss's] death."  *Id.*  At the conclusion of the review, PrimeCare authored a "Mortality Review report."  *Id.*

Weiss's estate sued the County, the therapist who treated Weiss in jail, and PrimeCare under § 1983.  *Id.*  In discovery, the estate requested a copy of, among other things, the mortality review report created by PrimeCare.  *Id.*  PrimeCare objected to the release of the report and invoked the protection of Pennsylvania's Peer Review Protection Act, 63 Pa. Stat. Ann. § 425.1 et seq. (1996).  *Id.*

The district court compelled PrimeCare to disclose the mortality review report in

15

discovery.  The district court concluded that "[a]lthough the interests reflected in the state privilege are important, they are insufficient to outweigh the need for probative evidence in this case."  *Id.* at 206.  Recognizing that the case involved "questions integral to the development of federal policy concerning the civil rights of inmates suffering form mental health problems," the district court reasoned that "to preclude discovery of the Mortality Review report here would be detrimental to the development of that policy."  *Id.* at 206–07.  Thus, the district court found that "reason and experience dictate that Pennsyvania's peer review privilege not be applied as federal common law in this instance."  *Id.* at 207.

The Court is persuaded by the reasoning of *Agster* and *Weiss*, both of which considered whether to recognize a federal peer review privilege in circumstances identical to this case.  Reason and experience lead against the creation of a peer review privilege in the context of federal civil rights cases involving prisoner suicide deaths.

In addition, courts that have considered creating a federal peer review privilege in federal civil rights cases with slightly different facts have also concluded that reason and experience caution against the creation of such a privilege.  In one such case, *Jenkins v. Dekalb Cnty., Ga.*, 242 F.R.D. 652, 653 (N.D. Ga. 2007), Hoyt Jenkins, a seventy-one year old inmate at DeKalb County Jail in Georgia was found dead in his jail cell.  Jenkins had a history of mental illness.  *Id.*  The evidence suggested that Jenkins, an elderly man weighing one hundred and forty-four pounds, was killed by his cellmate, a "large and violent inmate."  *Id.* at 654.

Jenkins's estate filed a § 1983 case against DeKalb County and other county officials alleging violations of the Eighth and Fourteenth Amendments, as well as pendant state law claims.  *Id.*  In essence, Jenkins's estate alleged "that Defendants are responsible

16

for Jenkins's death; that jail officials intentionally switched Jenkins's cell assignment in order to teach him a lesson; that the officers acted with a deliberate indifference for Jenkins's well being; and that jail employees were improperly trained and acting pursuant to flawed jail policies." *Id.*

In discovery, Jenkins's estate deposed William Brickhouse, the Mental Health Director for the DeKalb County Jail and employee of MHM Correctional Services, Inc., a company that provided medical services to the jail's inmates. *Id.* At his deposition, Brickhouse stated that he participated in a post-death investigation and prepared a "Mortality and Morbidity report" relating the Jenkins's death. *Id.* However, when questioned about the investigation, Brickhouse's counsel "refused to allow him to answer questions about the contents of the report," invoking Georgia's peer review privilege. *Id.*

In a well-written opinion, the district court determined that federal law of privilege applied, and, under federal law, there is no peer review privilege. *Id.* at 655. Moving to whether the district court should recognize a new privilege in the circumstances, it concluded that it would not do so. The district court, after an extensive discussion of the history of § 1983 concluded:

> There are unique considerations at play in a post-death investigation ordered by a county jail that dramatically weaken the case for recognizing the privilege. A review of a deceased inmate is not the straightforward evaluation of medical care that occurs in the civilian context. The generation of post-death reports, including the one at issue in this case, may include details such as when jail officials notified medical officials of a particular problem, and whether there was a reason for non-medical officials to have monitored a situation more closely. Not only is this type of information "nonmedical," but it also may shed light, or at least raise an inference, of jail customs or policies.

17

*Id.* at 660.

*Jenkins* is consistent with *Agster* and *Weiss* and other district courts that have refused to create a peer review privilege in § 1983 cases brought by or on behalf of prison inmates.  See, e.g., *Lewis v. Cnty. of Henry*, No. 05-0270, 2006 WL 1843336 (S.D. Ind. June 29, 2006) (refusing to create peer review privilege in § 1983 prisoner medical malpractice case).  The Court joins the "vast majority of federal courts that have considered" and rejected the "creation of a federal common law medical peer review privilege."  *Williams v. Univ. Med. Ctr. of S. Nev.*, 760 F. Supp. 2d 1026, 1031 (D. Nev. 2010).

## V. CONCLUSION

For the reasons stated above, Grabow's motion to compel was granted.  Michigan's peer review privilege does not apply in this federal civil rights case.  Nor is a peer review privilege recognized in federal common law or warranted in this case.  While it may be that the evidence Grabow seeks to compel is inadmissible, that is not the issue before the Court.  At this point, the information is discoverable.[6]

SO ORDERED.

 S/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated:  July 3, 2013

----

[6] In its supplemental brief, CMS makes a unique argument that the discovery Grabow seeks is also protected by the attorney-client privilege because the peer review process was directed by CMS's corporate counsel.  While the Court agrees that specific questions, e.g. "What did you say to your attorney?", are attorney-client privileged, the otherwise non-privileged peer review does not become privileged simply because it was directed to take place by CMS's counsel.

18

12-10105 Grabow, et al v.
Macomb County, et al

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, July 3, 2013, by electronic and/or ordinary mail.

S/Sakne Chami
Case Manager, (313) 234-5160

19