UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KELLI ANN GRABOW, Individually and
as Personal Representative of the Estate
of KRISTINA PROCHNOW, deceased,

        Plaintiff,

v.                                           Case No. 12-10105

COUNTY OF MACOMB and AMY FRANKS,[1]       HON. AVERN COHN

        Defendants.

_____/

## MEMORANDUM AND ORDER GRANTING DEFENDANTS' MOTION ON THE PLEADINGS AND SUMMARY JUDGMENT AND DISMISSING CASE (Doc. 62)

### I. INTRODUCTION

This is a tragic 42 U.S.C. § 1983 prisoner-suicide case that led to Kristina Prochnow's (Prochnow) death. Plaintiff Kelli Ann Grabow (Grabow), as the personal representative of the estate of Prochnow, is suing defendants County of Macomb (the County) and Amy Franks (Franks), a deputy sheriff in the Macomb County Sheriff's Department (collectively, Defendants),[2] for failing to properly screen Prochnow as a suicide

_____

[1] Amy Franks's last name changed during the pendency of this case. The caption is changed from Amy White, the way she was originally named, to Amy Franks, her current name.

[2] Plaintiff also sued Anthony Wickersham, Catherine Stalinski, Kelly Hedke, and Gregory Shumacher. As explained in a prior order, these defendants were voluntarily dismissed. (Docs. 51, 52). In addition, Plaintiff sued Correctional Medical Services, Inc. (CMS), formerly Corizon, Inc., and CMS's mental health clinicians Michelle Mason (Mason) and Stephanie Harmon (Harmon). Plaintiff settled with CMS, Mason, and Harmon. On October 9, 2013, the Court granted Plaintiff's motion to approve the partial settlement (Doc. 65) as to the CMS defendants and dismissed them from the case. *See*

risk and denying her medical treatment while she was an inmate at the Macomb County Jail.  Prochnow hung herself in her cell.  She died in the hospital three days later.  Plaintiff says Franks's actions and inactions are a proximate cause of Prochnow's death and that Franks was deliberately indifferent to Prochnow's risk of suicide.

The second amended complaint is in four counts, phrased by Plaintiff as follows:

| | |
|---|---|
| Count I | Denial of Medical Treatment – For Serious Medical Needs (Franks and County) |
| Count II | Failure to Train, Inadequate Policies and/or Procedures, Customs and Practices and Failure to Supervise – Deliberate Indifference (County) |
| Count III | Intentional Infliction of Emotional Distress[3] |
| Count IV | Gross Negligence, Intentional, Willful and Wanton Conduct (Franks and County) |

Now before the Court is Defendants' motion for judgment on the pleadings and summary judgment (Doc. 62).  For the reasons that follow, Defendants' motion is GRANTED.  This case is DISMISSED.[4]

## II. BACKGROUND

### A. The Arrest

On Saturday, August 13, 2011, at approximately 3:00 a.m., Prochnow's boyfriend Nicholas D'Aquila (D'Aquila) called the police after she locked him out of their condominium

_____

(Doc. 72).

[3] In Plaintiff's response to Defendants' motion for judgment on the pleadings and for summary judgment, she agreed to dismiss the intentional infliction of emotional distress claim.  *See* (Doc. 66 at 28, Pl's. Resp. Br.).  Accordingly, Count III of the second amended complaint is DISMISSED.

[4] Given this conclusion, Defendants' motion for leave to file notices of non-party at fault (Doc. 73) is DISMISSED AS MOOT.

2

in the City of New Baltimore.  (Doc. 63-4 at 10–11, D'Aquila Dep.).  Police officers from the New Baltimore Police Department (NBPD) responded to D'Aquila's call.  They knocked on the door; Prochnow did not answer.  They told D'Aquila there was nothing they could do and they left.  (*Id.* at 11).

D'Aquila called the police again later that day when he returned from work around 12:30 p.m.  (*Id.*).  At his deposition, D'Aquila explained why he called the police on Prochnow the second time:

> A. It was early Saturday.  I only worked until about 12:30, 1:00.  I came back and she was still acting kind of weird, and I pretty much telling her I had enough, I don't think I can do this anymore, and she spazzed out at me again.  She kind of came at me aggressively.  Her mother was there . . . and I said, "That's it.  You got to leave or I'm calling the police."  Because she needed help.  There was something wrong with her, so –
>
> Q. Did you call the police to help her?
>
> A. Yeah.
>
> Q. Why did you want her to get help?
>
> A. She – Because she wasn't helping herself.
>
> Q. Did you think that maybe she was taking some other drug that day that was making her act like this?
>
> A. I don't know.  I don't know.  The last few weeks she bottle up to me and wasn't talking too much to me.  She was acting weird.  I didn't know what was going on with her.

(*Id.*).

The NBPD responded to D'Aquila's call.  After talking to Prochnow, police officers arrested her for domestic violence. (Doc. 64-1 at 2, Jail Records).  Prochnow also had an outstanding warrant for her arrest because she failed to appear for sentencing in two unrelated cases.  (Doc. 64 at 5, Hearing Transcript).  According to D'Aquila, Prochnow was

3

loud and aggressive, acting crazy, and ran away from the police, who had to "chase her down and taser her."  (Doc. 63-4 at 12, D'Aquila Dep.).

The arresting officer filled out a "Jail Detention Card" in connection with Prochnow's arrest.  (Doc. 64-1 at 2, Jail Records).  Macomb County regulations require "Arresting officers and/or transporting officers" to "present a fully completed Macomb County Sheriff's Office 'Jail Detention Card' for each individual presented for incarceration."  (Doc. 64-2, Macomb County General Order 5.02).

On the Jail Detention Card, the box "No" was checked for the question, "Has the prisoner verbalized thoughts of suicide?"  (Doc. 64-1 at 2, Jail Records).  In addition, the officer checked "no" to the box stating, "Is the Prisoner Assaultive," and "yes" to the question, "Known Medical Problems?"  (*Id.*).

**B. The Jail Intake**

Prochnow was transported by the NBPD officers to the Macomb County Jail (the jail), where she arrived at approximately 2:25 p.m.

### 1. The regulations

County regulations provide procedures for accepting inmates for incarceration.  Specifically, "[w]hen an individual is presented at booking by a law enforcement agency for incarceration, booking officers shall be responsible for ensuring that the individual is acceptable for incarceration."  (Doc. 64-2 at 2, Macomb County General Order 5.02).  It is the "duty of the booking officers to determine if each individual presented for incarceration is in need of immediate medical and/or psychological evaluation/treatment." (*Id.*).

Specifically, the regulations provide that "[o]nce an individual is searched and accepted for incarceration," the following is to occur:

4

A.   Macomb County Jail Receiving/Screening
All inmates will be assessed immediately upon intake to ensure that any necessary treatment is provided. Inmates will not be placed in a cell alone until they have been booked/processed. At a minimum, the Macomb County Jail "Intake Classification/Temporary Cell Assignment" form must be completed as soon as possible and acted on. In the rare circumstance this is not possible, the officer will observe these inmates every (15) minutes and document these observations in the logbook until the inmate is processed.

The booking staff will complete the top portion of the Macomb County Jail "Medical History and Screening form" (medical questionnaire) for each inmate processed into the facility. If during the booking process the inmate appears to be in need of treatment, a member of the medical staff will be advised. The bottom portion of the "Medical History and Screening" form will be completed by the medical staff.

B.   Initial Classification/Temporary Cell Assignment Form
All inmates will be evaluated to ensure that appropriate housing needs are met. The booking staff will complete the "Initial Classification/Temporary Cell Assignment" form. **All** sections of this will be fully completed by asking the inmate specific questions and by making visual observations of the inmate during the assessment process.

Upon completion of the questionnaire, a temporary housing assignment and level of supervision will be assigned (pending formal classification). This temporary housing assignment must be entered in the Jail Management System. The assignment will be based upon available information, officer's observations and needs indicated by the inmate (e.g., drug withdrawal, suicidal thoughts, prior suicide attempts, etc.). If the inmate indicates a need for mental health screening and/or close/high observation due to a potential for self-harm or mental instability, the inmate should be referred to the Mental Health staff, or medical staff if Mental Health staff is unavailable, and housed appropriately pending screening. See **General Order 5.12: Mental Health Housing.**

Pre-classification prisoners with assaultive felony charges will be housed separate from pre-classification non-assaultive prisoners.

(*Id.* at 4–5).

The intake process described above is known as "initial assessment." Initial assessment is defined in the County regulations as "an interview with the prisoner, which is conducted upon intake. This initial assessment/interview will determine the prisoner's

5

immediate temporary cell assignment, level of supervision, special housing needs and emergency medical or mental health needs."  (*Id.* at 8).

The County's regulations define "Special Management Inmates/Housing."  Among these categories are:

A.    High Observation (HIO)
      Prisoners placed on High Observation Status are actively suicidal, detoxing or in need of the highest level of supervision and appropriate housing.

B.    Close Observation (CLO)
      Prisoners who are not actively suicidal but who may have a recent history of suicide attempt(s), self-destructive behavior or other need for Close Observation.

C.    Suicide (SUI) Caution
      Prisoners who have been suicidal, or have indicated the intent to harm themselves.  Prisoners with a suicide caution may or may not be on high observation.

* * * *

N.    Special Alert (SAO)
      Special Alert for officers. (e.g., detox, special housing).

(Doc. 64-2 at 10–11, Macomb County General Order 5.04).  *See also* (*id.* at 18, Macomb County General Order 5.11; *id.* at 23, Macomb County General Order 5.12).

In determining where to place an incoming inmate for a temporary cell assignment, the booking officer "takes into consideration current charges, legal status, and current physical/mental and medical condition, predatory risk, among other factors."  (*Id.* at 12). The regulations contain specific risk factors for "suicide potential."  These risk factors include "feeling hopeless or helpless, references to death, decline in personal hygiene, social withdrawal, sudden mood changes, crying spells, disturbed sleeping or eating patterns, changes in behavior, giving away personal property, etc. . . ."  (Doc. 64-2 at 19,

Macomb County General Order 5.11).

Initial intake screening is not the responsibility of the booking officer alone.  The County's regulations provide that "[c]orrections personnel *as well as a member of the health services staff* will screen all prisoners received into custody (new admissions and transfers) at intake."  (*Id.* at 19) (emphasis added).

If it is determined that an inmate poses a risk of suicide, staff must take the following precaution:

> When it's determined that a prisoner may pose a risk of suicide or harm to others, a "SUICIDE CAUTION" will be entered in the jail computer system.  The prisoner will be placed into a High Observation cell.  This caution will be for informational purposes and will prevent an inadvertent cell reassignment to general population. The officer making the cell change will enter "Y" in the mental health referral field of the note screen.  Prisoners on high Observation must be moved to a designated High Observation cell.
>
> Clearances for return to general population will be made by entering an "N" in the mental health referral field of the notes screen.  Only an authorized Mental Health worker, Classification Officer, or Jail Command Officer can make these computer entries.

(*Id.* at 26).

### 2. Prochnow's booking intake

When Prochnow arrived at the jail, she first interacted with corrections deputy Beverly Puchovan (Puchovan) in the booking intake area.  Puchovan prepared Prochnow for the booking process by patting her down and asking her to remove her earrings, necklace, and belly button ring.  (Doc. 62-3 at 7, Puchovan Dep.).

At Puchovan's deposition, she recalled that she asked Prochnow "if she had ever been here [the jail] before; I [Puchovan] asked her if she had ever attempted to commit suicide; and I asked her if she was feeling like she was going to hurt herself now."  (*Id.*).

7

Puchovan typically asks these questions to every inmate "to separate those that [she] believe[s] are, or even tell [her] that they're suicidal, and those that are not." (*Id.* at 11). According to Puchovan, Prochnow told her that she had been in the jail before, but that she had never attempted suicide and did not feel like she wanted to hurt herself. (*Id.* at 8).

After Puchovan completed the "pat down," Franks, who was also working in the booking area, asked Puchovan if Prochnow was "good to go." (Doc. 62-2 at 10, Franks Dep.).[5]  Franks explained at her deposition that, by "good to go," she was asking whether Puchovan had asked Prochnow the "suicide questions." (*Id.*).  Puchovan responded that "we're good to go." (Doc. 62-3 at 10, Puchovan Dep.).

Pursuant to the County's regulations, a Jail Initial Classification/Temporary Cell Assignment form was completed for Prochnow.  The form shows that it was completed by Franks.  However, Franks admitted that she did not conduct a face-to-face interview with Prochnow and did not ask Prochnow any of the questions on the form. (Doc. 62-2 at 24, Franks Dep.).  For all intents and purposes, the form was falsified.

Specifically, the Jail Initial Classification/Temporary Cell Assignment form contained a "Suicidal Risk Questionnaire." (Doc. 64-1 at 6, Jail Records).  The following are the Suicidal Risk Questionnaire questions which Franks answered "no" to without asking the questions to Prochnow:

> Does inmate hold position of respect or prominence in the community or is the offense shocking in nature?

---

[5] Franks was assigned to the computer in the booking area where she entered each inmate's information into the computer. (Doc. 62-2 at 9, Franks Dep).  The computer area was away from where Puchovan and Prochnow were standing; it was on the other side of glass. (*Id.*).  Franks says she did not hear the conversation between Puchovan and Prochnow.

Do you have any unusual home or family problems we should know about? List:

Have you ever been in a mental institution or had psychiatric care?  List:

Have you ever attempted or contemplated suicide?  When?  Where?

Are you now contemplating suicide?

Does the Inmate's behavior suggest a Suicide Risk?

(*Id.*).

The Jail Initial Classification/Temporary Cell Assignment form indicates that, "[i]f any of the above answers indicate YES, a Mental Health Referral Form must be completed, Jail Command notified and appropriate housing/supervision level assigned."  (*Id.*).

After "the completion of the entire booking process the inmate will be placed in a cell affording the appropriate level of supervision.  The appropriate[] cell assignment shall be noted in the computer."  (Doc. 64-2 at 6, Macomb County General Order 5.02).  The "Drill Down Detail Report," which notes any time an inmate is moved to a different cell, shows that Prochnow was placed in holding cell 10 in the booking area at 2:34 p.m.  (Doc. 64-1 at 20, Drill Down Report).  Holding cell 10 is where new female inmates are first brought and is a general population holding cell.  (Doc. 62-2 at 7, Franks Dep.).  This cell does not have any beds.

In addition to conducting a booking intake and filling out the Jail Initial Classification/Temporary Cell Assignment form, booking officers have access to the jail's "Offendertrak" computer system.  The computer system allows booking officers to search by inmate name and view the inmate's history at the jail.  Specifically, booking officers would be apprised to any "alerts" in the system for a given inmate based on prior incarcerations.  The record does not reflect whether this information can be accessed any

9

other way besides using the Offendertrak system.

Had Franks used the Offendertrak system and searched for Prochnow, she would have known that Prochnow had been on suicide watch in the jail in 2008 for two days, and that she had been placed on medium security on a prior occasion. (Doc. 67-1, Floor Sheet Booking; Doc. 66-8 at 13, Medley Dep.; Doc. 64-1 at 10, Jail Records). This information appears in the "active alerts" in the Offendertrak system when searching Prochnow's name.

Franks's shift ended at 4:00 p.m. and she left while Prochnow was still in holding cell 10. (Doc. 62-2 at 17, Franks Dep.). Franks did not talk to Prochnow or otherwise make any contact with her during her shift.

**C. Prochnow's Medical Evaluation**

After Franks left for the day, CMS nurse Michelle Mason (Mason) performed a medical evaluation of Prochnow. In conducting the medical evaluation, Mason "glanced through" the Jail Initial Classification/Temporary Cell Assignment Form that was filled out. (Doc. 62-4 at 15, Mason Dep.). Mason testified at her deposition that she did not rely on the form when she conducted her medical evaluation: "Again, all I can say is that I base my nursing assessment and I make my judgment upon what I see and what I assess because it's my responsibility to do so." (*Id.* at 29). In addition, when conducting the medical intake assessment, Mason did not refer to the Offendertrak system which would show Prochnow's prior history at the jail. (*Id.* at 13).

Mason filled out a CMS "Referral to Mental Health" form. On this form, Mason noted that Prochnow had depression and was bipolar. (Doc. 64-1 at 11, Jail Records). She also noted that Prochnow "feels hopeless/helpless about being here. Very angry and kicking in cell and yelling in cell. Domestic abuse in household." (*Id.*). The referral form also

10

indicated that Prochnow "cut her wrist" in a "suicide attempt" over one year ago.  (*Id.*).

Mason also filled out a "Memo to Jail Command" in connection with her evaluation of Prochnow.  (*Id.* at 12).  In the memo, Mason noted that Prochnow should be placed in a detoxification unit for 10 days.  (*Id.*).  Mason did not opine that Prochnow should be placed on high observation or suicide watch.  In Mason's judgment, Prochnow did not present a risk of suicide.

In addition, Mason filled out a CMS "Jail Medical Intake Screening" form.  (*Id.* at 13).  On this form, Mason noted that Prochnow was taking adderall and lithium for a year due to her depression and because she was bipolar.  (*Id.* at 14).  Mason also answered "yes" to the question that asked whether Prochnow had ever tried to hurt or kill herself.  (*Id.*).  Mason noted that Prochnow cut her wrists "> 1 yr ago."  (*Id.*).

The Jail Medical Intake Screening form was signed by Prochnow.  She signed the "INMATE ACKNOWLEDGMENT AND GENERAL CONSENT" which states:

> I acknowledge that I have answered all questions truthfully and have been informed how to obtain health services.  I consent to routine health care provided by the facility healthcare staff.  I understand that if the medical department must store any medications brought into the facility they will be destroyed if not picked up within 3 days of my release.  Facility or medical staff must destroy pills in unlabeled or mislabeled containers.

(*Id.* at 14).

Finally, Mason completed a "Withdrawal Initial Screening & Treatment Plan."  This form again noted Prochnow's prior suicide attempt, her depression, and anxiety.  (*Id.* at 15).  On the "Plan" section of the form, Mason stated that Prochnow should be observed every 12 hours for 10 days.  (*Id.*).  She also noted that Prochnow should be assigned a bottom bunk, and that she should be observed for withdrawal symptoms.  (*Id.*).  In addition, Mason

11

checked the following box on the form: "Continue to monitor for suicide risk, depression and psychiatric co-morbidities." (*Id.*).

At 10:19 p.m., Prochnow was moved from holding cell 10 to holding cell 11. (Doc. 64-1 at 20, Drill Down Report). Holding cell 11 is the second cell in the booking area for female inmates. Holding cell 11 is used for inmates staying at the jail for more than "just a few hours." (Doc. 62-2 at 7, Franks Dep.).

**D. Sunday, August 14, 2011**

Franks worked the next day, Sunday, in the booking area. (Doc. 62-2 at 26, Franks Dep.). When Franks arrived to work, she saw Prochnow in holding cell 11. (*Id.*). Franks testified that she moved Prochnow to the "B Unit" a couple hours after her shift started. (*Id.* at 27). The B Unit is used for overflow and is also on the booking floor. Franks testified at her deposition that, "[i]f there's no room upstairs, then they either stay in the holding cells, or if we have overflow, which we did that day, or that weekend, shall I say, in B unit, we had females, that was the overflow for that weekend." (*Id.* at 29). The Drill Down Report shows that at 10:01 a.m., Prochnow was moved from holding cell 11 in the booking area to Unit B and placed in holding cell 18. (Doc. 64-1 at 20, Drill Down Report). The holding cells in the B Unit contain double bunks in each room and a "commons" area with two tables. (Doc. 62-2 at 27–28, Prochnow Dep.).

At her deposition, Franks testified that she understood that a booking nurse was supposed to complete an intake for all incoming inmates within the first eight hours of the inmate arriving at the jail. (*Id.* at 28). At her deposition, Franks testified:

Q. How do you, as the computer person in the booking area, know whether the booking nurse has actually seen a given inmate?

12

A. We don't.

Q. So there's like no real notification type process?

A. Not unless they gave us a notification, again, if they want them housed in a specific area.

Q. Obviously you never got anything like that relative to Kristina from anybody?

A. Yes, there was one for her to be placed on detox.

Q. When was that, do you know?

A. Afternoon shift on the 13th.

Q. Did you learn that for the first time when you got here then on the 14th?

A. Yes.  It should – I don't recall it being stapled to her card, but it should have been stapled to her card.

Q. Her – what card?

A. Her – well, we call it our booking card even though it's not the initial booking card. It's the card that has her picture on it that has her charge and her address on it.

Q. So when you were here on the 14th, you saw that note or card?

A. I don't recall, but I'm sure I did.

(*Id.* at 29).

Franks testified that Prochnow was not shaking or vomiting and that she did not have tremors or sweats.  (*Id.*).  In fact, Franks specifically recalled having a conversation with Prochnow in the doorway of the B Unit:

Q. Did you actually have interaction with her while she was in 17 that day, or at least in the commons area or somewhere in that area?

A. Like I said, just in the doorway during feeding.

Q. Any problem?

A. No, not at all.  We were actually joking around.

13

Q. What were you joking about?

A. Stuff that she stole from Wal-Mart.

Q. And when did she tell you she stole stuff from Wal-Mart?

A. I don't remember the exact of when she did or I couldn't even tell you right now what she stole, but all I remember was I was very surprised when she passed because – I just made the comment, I made the comment that, what, we were just joking around at lunch time about how funny it was what she took.  I mean I was very surprised.

So I don't remember the entire conversation, but she was in good spirits and ripping on herself, actually.

Q. Like how so, when you say ripping herself, like making –

A. Making –

Q. – light of the situation?

A. Making light of stealing stuff from Wal-Mart.

(*Id.* at 28).

Other than the above, the parties agree that Franks did not have further interaction with Prochnow.  (Doc. 63 at 7; Doc. 66-1 at 3).  Franks testified at her deposition that she did not observe Prochnow exhibiting the physical characteristics of a person who was withdrawing.  (Doc. 62-2 at 29, Franks Dep.).  In addition, Franks testified that Prochnow never asked for any of her medications.  (*Id.*).

**E. The "Substance Abuse Withdrawal Flowsheet"**

Because Mason noted that Prochnow was detoxing, CMS staff monitored her for withdrawal from "Benzodiazepine, BWS-C, Opioid and COWS."  Every 12 hours, CMS staff visited Prochnow in her cell and took her temperature, pulse, blood pressure, and noted other observations on a "Substance Abuse Withdrawal Flowsheet."  (Doc.  64-1 at 17,

14

Detox. Flowsheet).  The Substance Abuse Withdrawal Flowsheet has four entries from August 13 through August 15.  (*Id.*).

**F. Monday, August 15, 2011**

Franks did not work on Monday, August 15, 2011.  As she testified at her deposition, she "took a sick day."  (Doc. 62-2 at 30, Franks Dep.).

Prochnow was taken to a scheduled court hearing at Macomb County Circuit Court in the late morning regarding her failure to appear for sentencing in two cases on July 7, 2011.  (Doc. 64 at 5, Hearing Transcript).  At the hearing, the judge set aside the bench warrant that was issued for Prochnow and reinstated bond.  (*Id.*).  The judge simultaneously cancelled the bond, imposed a $5,000 cash bond for each case, and set a sentencing date for August 30, 2011.  (*Id.* at 5–7).

Prochnow was brought back to the jail after the hearing and placed back in holding cell 18 in the B Unit.  A little before 3:00 p.m., Mason saw Prochnow in her cell when Mason was going out for a break.  (Doc. 62-4 at 40, Mason Dep.).  Prochnow called out to Mason through the glass of the cell and told Mason that she had a rash.  (*Id.*).  Mason told Prochnow that she would take a look at it when she returned from her break.  (*Id.*).

While Mason was on break, Prochnow attempted suicide by hanging herself in the cell.  Medical attention was provided to Prochnow and she was transferred to Mt. Clemens Regional Medical Center where she died two days later on August 17, 2011.

**G. Inmate Baumgart Observes Prochnow in Holding Cell**

Brittany Baumgart, who was also in the B Unit, testified at her deposition regarding how she observed Prochnow acting over the few days she was there.  Baumgart testified:

Q. We've looked at an original statement that you provided on August 15, 2011.

15

A. Yes.

Q. And we've marked that as Exhibit 1 to your deposition.  In this statement you indicated that Ms. Prochnow seemed "as usual, very flighty and distracted but not down," is that correct?

A. Um-hum, yes.

Q. What'd you mean by "very flighty?"

A. Just all over

Q. And by that do you mean, well, describe to me what that means?

A. From one end of the hall to another end of the hall to her room.

Q. Physically moving?

A. Um-hum, yes.  On one subject to another subject.

Q. When she spoke, did she make sense?

A. Yes, you could follow her, yes.

Q. What'd you mean by "distracted?"

A. In her thoughts, she seemed distracted by her thoughts.

Q. How so?

A. As like when I had asked her about court, she didn't seem to want to talk about it.  She seemed distracted by her thoughts and was kind of sullen about it, I guess.

(Doc. 62-5 at 18, Baumgart Dep.).

Baumgart was specifically asked whether she ever personally witnessed Prochnow behave in a way that made her believe that Prochnow needed the attention of a corrections officer. (*Id*.).  Baumgart stated that she did not. (*Id*.).  However, Baumgart testified that she saw Prochnow throwing up and constantly on the toilet which made her believe that she needed to see a nurse.  (*Id*.).  Baumgart did not see Prochnow throwing up or on the toilet

16

on August 15.

Baumgart also testified that on August 15, Prochnow "looked like the walking dead. She was very thin. She couldn't get out of the shower because she was aching so bad – I mean, she couldn't get out of bed. . . ." (*Id.* at 19).

### H. Sheriff Anthony Wickersham's Testimony

Macomb County Sheriff Anthony Wickersham (Wickersham) testified at his deposition that an investigation subsequent to Prochnow's hanging uncovered that the booking intake form was falsified by Franks without her conducting a face-to-face assessment. (Doc. 66-6 at 10, Wickersham Dep.). According to Wickersham, this was connected to Prochnow's suicide:

**A. Well, I think as a matter through the investigation, it was found – determined that – of how this form was completed.**

BY MR. JOHNSON:

Q. And the suicide.

**A. And the suicide, yes.**

Q. So, you would agree that there were – was it, at least on some level, a connection between those two?

MR. BROWN: Same objection. Objection to the form and foundation. Calls for a legal conclusion. If he can answer.

**A. I would say yes.**

(*Id.*).

### I. Jail Administrator Michelle Sanborn's Testimony

Macomb County Jail Administrator Michelle Sanborn (Sanborn) reviewed the booking intake and Mason's mental health intake during the County's investigation following

17

Prochnow's suicide.  (Doc. 66-7 at 17, Sanborn Dep.).  Sanborn testified at her deposition

that Prochnow should have been placed on high observation:

> Q. Okay.  Ms. Franks, if she contributed by putting no, or she never asked my client those answers and put her general observations, you would, likewise, be critical – I will use the word "critical," – of her for not doing her job, wouldn't you?
>
> **A. I wouldn't use the word "critical" –**
>
> Q. What would you –
>
> **A. – I would say it's inappropriate.**
>
> Q. Shouldn't happen that way.
>
> **A. Correct.**
>
> Q. And at least one of the reasons – one of many reasons why, ultimately, my client was successful in harming herself was because she was in general obs.
>
> > MR RICHTARCIK: Objection as to foundation.
>
> **A. I would say her placement was inappropriate.**
>
> BY MR. JOHNSON:
>
> Q. Which you believe played at least a role in her suicide and death.
>
> > MR RICHTARCIK: Objection as to foundation.
>
> **A. Yes, sir.**

(*Id.* at 25).

## III. LEGAL STANDARDS

### A. Fed. R. Civ. P. 12(c)

A motion for judgment on the pleadings under Rule 12(c) utilizes the same pleading

standard applicable under Rule 12(b)(6).  *Wee Care Child Ctr., Inc. v. Lumpkin*, 680 F.3d

841, 846 (6th Cir. 2012).  To survive a Rule 12(b)(6) motion to dismiss, the complaint's

18

"factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007). *See also Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio,* 502 F.3d 545, 548 (6th Cir. 2007). The Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).

Moreover, "[o]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* In sum, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Id.* at 678 (internal quotation marks and citation omitted).

## B. Fed. R. Civ. P. 56

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party may meet that burden "by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Revised Rule 56 expressly provides that:

A party asserting that a fact cannot be or is genuinely disputed must support the

19

assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support a fact.

Fed. R. Civ. P. 56(c)(1).

The revised Rule also provides the consequences of failing to properly support or address a fact:

If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

(1) give an opportunity to properly support or address the fact;

(2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting materials–including the facts considered undisputed–show that the movant is entitled to it; or

(4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).   "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike Cnty. Bd. of Ed.*, 286 F.3d 366, 370 (6th Cir. 2002).

20

## IV. DISCUSSION

The Court will specifically address each of Grabow's claims separately below. However, the Court begins with a general observation to put Grabow's claims against the Defendants in context. While Franks's conduct borne out by the undisputed facts causes the Court great concern, Grabow fails to satisfy the Court that there are any genuine issues of material fact that Franks's actions and inactions were a proximate cause of Prochnow's suicide. *Doe v. Suillivan Cnty., Tenn.*, 956 F.2d 545, 550 (6th Cir. 1992) ("As offensive as these conditions may have been, they do not support plaintiff's Eighth Amendment claim absent proof that they proximately caused his injury."). The intervening events that occurred–particularly Mason conducting a medical intake on the same day Franks falsified the Jail Intake Classification/Temporary Cell Assignment form–show that others were alerted to Prochnow's condition after Franks was supposed to assess her. In addition to Mason conducting a medical assessment of Prochnow on the same day that Franks falsified the Jail Intake Classification/Temporary Cell Assignment form, Prochnow was monitored for withdrawals every 12 hours. Moreover, on the day that Prochnow hung herself, at least two deputy officers who took her to her court hearing and Mason observed her at some point during the day. Franks was not working that day.

More significantly, however, nothing in the record as it currently stands establishes that Prochnow would have been placed on suicide watch if Franks did a face-to-face assessment and did not falsify the Jail Intake Classification/Temporary Cell Assignment form. Had Franks followed County policy, it is speculative whether Prochnow would have answered "yes" to the question asking if she actively felt suicidal. Indeed, Prochnow had been asked that question at least three times that same day, each time answering no.

21

First, the arresting officer noted on the Jail Detention Card that Prochnow did not communicate any thoughts of suicide. Second, Puchovan testified that she specifically asked Prochnow if she was feeling suicidal and Prochnow answered that she was not. Third, after Franks left for the day, Mason conducted a face-to-face medical intake of Prochnow and Prochnow denied any thoughts of suicide.

Grabow's reliance on Wickersham's and Sanborn's testimony to the contrary is misplaced. Although Grabow had been placed on suicide watch at the jail in 2008, and Franks would have been alerted to this through the jail's computer system had she looked, it is not certain that Franks would have placed Prochnow on high observation or suicide watch during this incarceration. Franks would have been able to see that, although Prochnow was on suicide watch for two days in 2008, she finished the last month of her incarceration in general population. (Doc. 64-1 at 20, Jail Records). Moreover, Prochnow was incarcerated three times after that, each time being placed in general population. (*Id.*). Thus, Grabow cannot rely on the "alerts" in the jail's computer system as *ipso facto* proof that Franks would have placed Prochnow on high observation suicide watch had she done her job correctly. There has been no evidence to show that, had Franks conducted a face-to-face assessment, checked the computer system, and correctly filled out the Jail Intake Classification/Temporary Cell Assignment form, Prochnow would have been placed in a high observation cell and monitored for suicidal tendencies. Ultimately, this would have required Franks to come to a different conclusion than Mason did after Mason conducted a medical evaluation and decided that Prochnow was not a suicide risk.

Therefore, although the Court concludes that Franks was negligent when violating county policy, the undisputed facts show that her mishandling of the situation was not a

proximate cause of Prochnow's death.  With this underlying principle in mind, the Court addresses Grabow's claims below.

**A. Denial of Medical Treatment for Serious Medical Needs (Count I)**

Count I of Grabow's complaint states that Franks was deliberately indifferent to Prochnow's serious medical needs by (a) failing to properly screen Prochnow for suicide; (b) falsifying her intake forms which led to Prochnow not being placed on close observation; and (c) not providing Prochnow with her medication or proper medical treatment.  The undisputed facts do not establish that Franks was deliberately indifferent to Prochnow's serious medical needs.

**1. The Law – Deliberate Indifference**

As explained by the Supreme Court, "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."  *Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (citing *Helling v. McKinney*, 509 U.S. 25 (1993); *Wilson v. Seiter*, 501 U.S. 294 (1991); *Estelle v. Gamble*, 429 U.S. 97 (1976)).  To comply with the Eighth Amendment, "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates."  *Id.* at 832 (citations omitted).  In *Comstock v. McCrary*, 273 F.3d 693 (2001), the Sixth Circuit held that a prisoner who has been deemed suicidal is entitled to continuing medical treatment.

Deliberate indifference has both an objective and subjective component.  *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).  The objective component is satisfied by showing that an inmate has a medical need that is objectively "sufficiently serious."  *Farmer*, 511 U.S. at 834.  The subjective component requires that the "official being sued

23

subjectively perceived facts from which to infer substantial risk to the prisoner, that he did

in fact draw the inference, and that he then disregarded that risk." *Comstock*, 273 F.3d at

703. This requires "a sufficiently culpable state of mind. . . ." *Miller v. Calhoun Cnty.*, 408

F.3d 803, 813 (6th Cir. 2005 (citation omitted).

    In the context of prisoner-suicide cases, the Sixth Circuit has stated:

> [T]he proper inquiry concerning the liability of a City and its
> employees in both their official and individual capacities under
> section 1983 for a jail detainee's suicide is: whether the
> decedent showed a strong likelihood that he would attempt to
> take his own life in such a manner that failure to take adequate
> precautions amount to deliberate indifference to the decedent's
> serious medical needs.

*Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005) (quoting *Barber v. City of Salem*,

953 F.2d 232, 239–40 (6th Cir. 1992)); *see also Galloway v. Anuszkiewicz*, 518 F. App'x

330, 333 (6th Cir. 2013).

### 2. Analysis – This Case

#### i. The objective prong

    Grabow must first establish that objectively, Prochnow's medical need was

"sufficiently serious," i.e. that there was a strong likelihood that Prochnow would commit

suicide. *Perez v. Oakland Cnty.*, 466 F.3d 416, 424 (6th Cir. 2006). Grabow argues that

Prochnow's death establishes the obviousness of her mental health condition and the fact

that she was going to commit suicide. This element is a close call. Ultimately, when the

evidence is viewed liberally and in a light most favorable to Grabow, genuine issues of

material fact exist as to whether Prochnow objectively exhibited a strong likelihood of

committing suicide.

    The facts that support Grabow's position are as follows. Prochnow was bipolar and

suffered from depression. She had been incarcerated multiple times in the past. At some point in her past incarcerations, Prochnow notified jail staff that she attempted suicide in the past by cutting her wrists. When Prochnow was incarcerated in 2008, she was placed on suicide watch for two days of her incarceration. This information showed up in the jail's Offendertrak system. Moreover, in the days before she hung herself, Prochnow reported to Mason during the medical intake assessment that she attempted suicide in the past. Baumgart stated that, on the day Prochnow hung herself, she "looked like the walking dead."

Although the facts above are favorable to Grabow's position, it is questionable whether they would lead an objective observer to conclude that Grabow was at risk of committing suicide when she entered the jail on August 13. Prochnow had been to the jail on multiple prior occasions, placed in general population, and had never once attempted to commit suicide in the jail. *But see Perez*, 466 F.3d at 424–25 (finding that multiple past threats and suicide attempts in jail, and placement on suicide watch in past incarcerations, provides support for the objective conclusion that inmate should have been kept under close observation). Although Grabow makes much of the fact that there was an alert in the Offendertrak system indicating Prochnow had been a suicide risk on a prior occasion, this related to Prochnow's incarceration in 2008. As explained above, during Prochnow's 2008 incarceration, she was placed on suicide watch for two days. However, Prochnow ultimately completed the final month of her incarceration in general population. In addition, after her 2008 incarceration, she returned to the jail on three separate occasions and was placed in general population each time.

Although the Court is skeptical that the evidence proffered by Grabow supports a

25

finding that, objectively, Prochnow presented a risk of suicide when she entered the jail on August 13, ultimately it is for a fact finder to weigh the evidence. Thus, a question of fact remains on the objective element of the deliberate indifference test.

### ii. The subjective prong

The Court's inquiry is not over with a finding that genuine issues of material fact exist as to the objective element of Grabow's deliberate indifference claim. Grabow must show that Franks (1) "subjectively perceived facts from which to infer a substantial risk to" Prochnow; (2) "did in fact draw the inference"; and (3) "disregarded that risk." *Galloway v. Anuszkiewicz*, 518 F. App'x 330, 333 (6th Cir. 2013) (citation omitted). Therefore, "to be held liable, '[a] prison official must be cognizant of the significant likelihood that [the detainee] may imminently seek to take his own life and must fail to take reasonable steps to prevent the [detainee] from performing this act.'" *Id.* (citing *Linden v. Washtenaw Cnty.*, 167 F. App'x 410, 416 (6th Cir. 2006)). Grabow cannot meet this "stringent standard of fault, requiring proof that [Franks] disregarded a known or obvious consequence of [her] action." *Connick v. Thompson*, ___ U.S. ___, 131 S.Ct. 1350, 1360 (2011) (citation omitted).

First, Grabow has not established that Franks subjectively perceived facts from which she could infer that there was a substantial risk that Prochnow would commit suicide. Franks had a general recollection of who Prochnow was, but did not remember any details of her past incarcerations. During the 2008 incarceration where Prochnow was placed on suicide watch for two days, Franks was not working. Even if Franks had been working at the time and was aware that Prochnow was placed on suicide watch, she would have also known that Prochnow completed the remaining month of her incarceration in general

26

population.  In addition, Prochnow was incarcerated three subsequent times and each time was placed in general population.

In order to satisfy the first prong of the subjectivity test in the context of prisoner-suicide cases, the Sixth Circuit has required sufficient facts that show how the jail official was alerted to the inmate's suicide risk.  *See Perez*, 466 F.3d at 425 ("Throughout her time treating [the inmate], [the jail official] made the decision, on several occasions (most recently a month before he committed suicide), to place [the inmate] on an elevated watch status and to house [the inmate] in an observation cell or with roomate(s)."); *Cooper v. Cnty. of Washtenaw*, 222 F. App'x 459, 469 (6th Cir. 2007) (reasoning that jail official's presence at inmate's court hearing where judge put inmate on suicide watch, in conjunction with his ability to see inmate wearing a "bam bam" gown and being housed in an observational cell, indicated that jail official had at least perceived enough facts to give rise to an inference that inmate would commit suicide).  Similar facts are missing here.  Here, the undisputed evidence shows that the only thing Franks knew was that Prochnow was arrested and brought to the jail on multiple occasions in the past, and that she was currently in jail for domestic violence.

Even if the "alerts" available on the jail's Offendertrak system, and all other information that Franks would have obtained if she completed the booking form properly–specifically the alert relating to Prochnow's 2008 incarceration where she was placed on suicide watch and that Prochnow had attempted suicide in the past–are imputed to Franks, this alone is not enough for Franks to have subjectively perceived a substantial risk to Prochnow.  Franks testified that Puchovan told her that Prochnow was "good to go" meaning that she denied being suicidal.  Franks would have also been aware that the

"suicide" alert dated back to 2008, and that Prochnow's suicide attempt–outside of the jail and only substantiated by her own admission–occurred long before her incarceration.

Second, assuming *arguendo* that Franks subjectively perceived enough facts on August 13 that alerted her that Prochnow was a suicide risk, Grabow has failed to proffer any evidence establishing that Franks in fact drew the inference that Prochnow was suicidal. To the extent that Grabow seeks to establish that Franks's failure to conduct a face-to-face interview with Prochnow is sufficient to satisfy the second prong of the subjective element, the Court is not persuaded. After Franks completed her shift on August 13, Mason conducted a medical intake assessment and talked to Prochnow. Thus, any failure to conduct a face-to-face interview with Prochnow was remedied when Mason conducted an assessment hours later. Franks testified that, when she came to work on August 14, it was likely that Prochnow's booking card showed that Mason had conducted a medical evaluation the day before. Prochnow told Mason about her past suicide attempt, but Mason ultimately determined that she did not pose a risk of suicide. Franks was permitted to rely on Mason's medical assessment that occurred hours later and two days before Prochnow committed suicide. *Galloway*, 518 F. App'x at 335–36 (citation omitted).

Finally, even if Franks perceived the risk and drew the proper inferences, Grabow has failed to proffer any evidence that Franks disregarded the risk. Again, Grabow's reliance on the fact that Franks did not conduct a face-to-face assessment cannot support a finding that Franks disregarded the risk. Grabow's response to Defendants' statement of undisputed facts states that "[b]ecause Franks fabricated the intake form instead of speaking with [Prochnow] as was required," the information related to Prochnow's mental health was not acquired. (Doc. 66-1 at 3). Essentially, Grabow's argument is that but-for

28

Franks not conducting a face-to-face assessment, Prochnow would have been placed in a high observation cell for suicide watch. The undisputed evidence shows otherwise. The same day Franks falsified the intake form, Prochnow was evaluated by CMS nurse Mason. Mason explicitly noted Prochnow's past suicide attempt in her paperwork. Nevertheless, Mason did not deem it necessary to place Prochnow in a high observation cell. Rather, Mason saw fit that Prochnow be monitored for withdrawals.

Although when the evidence is viewed liberally in Grabow's favor she may be able to establish the objective element of her deliberate indifference claim, no reasonable jury can conclude that Franks subjectively perceived facts to infer the risk of suicide, did in fact draw the inference, and disregarded that risk. Therefore, Grabow's deliberate indifference claim requires dismissal.[6] However careless Franks may have been, it does not rise to the high level of deliberate indifference.[7]

## B. Failure to Train/Supervise – Macomb County (Count II)

In Count II, Grabow seeks to establish municipal liability against Macomb County for failing to train/supervise Franks, and for having inadequate policies and/or procedures leading to constitutional violations. Because Grabow has not established a genuine issue of material fact regarding the underlying deliberate indifference claim against Franks, her

---

[6] Because the Court concludes that Grabow has not established a genuine issue of material fact regarding the deliberate indifference claim, a qualified immunity analysis is not necessary.

[7] To the extent that the deliberate indifference claim is based on a failure to provide Prochnow with her medications, the claim fails as a matter of law. Franks was not responsible, nor was she authorized, to hand out medication. More importantly, however, there are no facts which show that Prochnow requested and was denied medication.

29

claim against Macomb County must be dismissed.  *Thurmond v. Cnty. of Wayne*, 447 F. App'x 643, 651 (6th Cir. 2011) ([I]t is well settled that '[t]here can be no *Monell* [*v. Dep't of Soc. Serv. of N.Y.*, 436 U.S. 658 (1978)] liability under § 1983 unless there is an underlying unconstitutional act.'"), quoting *Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007). Although Franks may have acted negligently, there is no underlying unconstitutional act in which to find the County liable.

## C. Gross Negligence, Intentional, Wilful, and Wanton Conduct (Count IV)

In Count IV, Grabow asserts a state law claim of gross negligence against the County and Franks.

### 1. The County

Under Michigan's Tort Liability Act, governmental agencies are "immune from tort liability in all cases wherein the governmental agency is engaged in the exercise or discharge of a governmental function."  Mich. Comp. Laws § 691.1407(1).

Although governmental immunity is the starting point, the rule is not without an exception.  Here, Grabow seeks to invoke an exception to governmental immunity under Mich. Comp. Laws § 691.1407(4).  This section states:

> This act does not grant immunity to a governmental agency or an employee or agent of a governmental agency with respect to providing medical care or treatment to a patient, except medical care or treatment provided to a patient in a hospital owned or operated by the department of community health or a hospital owned or operated by the department of corrections and except care or treatment provided by an uncompensated search and rescue operation medical assistant or tactical operation medical assistant.

Grabow's attempt to get around governmental immunity through this exception fails. First, Prochnow was not a "patient" as the statute clearly requires.  She was an inmate at the jail.  Second, as Grabow's counsel conceded at oral argument, the deputies at Macomb

County do not provide medical care or treatment to inmates. They did not medically treat Prochnow. CMS provides medical care/treatment to inmates.

### 2. Franks

Under Michigan law, governmental employees acting on behalf of a governmental agency are immune from tort liability if "(1) the employee's challenged acts were undertaken during the course of employment and that the employee was acting, or reasonably believed he was acting, within the scope of his authority, (2) the acts were undertaken in good faith, and (3) the acts were discretionary, rather than ministerial, in nature." *Odom v. Wayne Cnty.*, 482 Mich. 459, 461 (2008). A governmental employee is not liable for personal injuries sounding in tort provided the employee's "conduct does not amount to gross negligence that is the proximate cause of the injury or damage." Mich. Comp. Laws § 691.1407(2)(c). Gross negligence is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results. *Id.* at § 691.1407(7)(a). "An employee's conduct is 'the proximate cause' of an injury if it is 'the one most immediate, efficient, and direct cause preceding an injury.'" *Bennett v. Krakowski*, 671 F.3d 553, 560 (6th Cir. 2011) (citing *Robinson v. City of Detroit*, 462 Mich. 439 (2000)).

Here, as explained above, Grabow has not proffered any evidence creating a genuine issue of material fact that Franks was "a" proximate cause of Prochnow's death, let alone "the" proximate cause required under the Michigan statute. Therefore, this claim fails against Franks.

### V. CONCLUSION

For the reasons stated above, Defendants' motion for judgment on the pleadings and for summary judgment was granted. As the Sixth Circuit recently explained, [p]rison

31

officials need only take reasonable precautions to prevent inmate suicide; they do not insure or guarantee the life of a prisoner." *Galloway*, 518 F. App'x at 334 (citations omitted).  Here, Grabow has failed to show that Franks or the County is responsible for failing to prevent Prochnow's suicide.

SO ORDERED.

s/Avern Cohn
UNITED STATES DISTRICT JUDGE

Dated:  October 29, 2013

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, October 29, 2013, by electronic and/or ordinary mail.

S/Sakne Chami
Case Manager, (313) 234-5160